CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Jul 11, 2022, 2:13 pm   cc
Pam Hartman Beyer, Clerk of Court

MOHAMMAD KHATIB
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: Mohammad.Khatib@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>          vs.<br><br>ALAN SCOTT RUDO,<br><br>                              Defendant. | )  CR. NO. **22-00055 JAO**<br>)<br>)  INFORMATION<br>)<br>)  [18 U.S.C. § 1349]<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INFORMATION

The United States Attorney charges:

Introductory Allegations

At all times material to this Information:

## I. *The defendant*

1.      Between September 2006 and December 2018, ALAN SCOTT RUDO, the defendant, was a Housing and Community Development Specialist at the Office of Housing and Community Development ("OHCD") for the County of Hawaii ("the County").

## II. *The County of Hawaii's Affordable Housing Policy and its Office of Housing and Community Development*

2.      The OHCD was responsible for the planning, administration and operation of the County's housing programs.  OHCD was created to assist in the development of viable communities that provided decent and affordable housing for residents of the County.

3.      The County maintained an affordable housing policy that was set forth in Chapter 11 of the Hawaii County Code.  A key objective of Chapter 11 was to "require residential developers to include affordable housing in their projects or contribute to affordable housing off-site."  Developers could satisfy this requirement either by building a specified number of affordable units in their projects or within a fifteen-mile radius of a project site, or by conveying land with infrastructure to the County or non-profit entities approved by the County.  The

2

requirement was designed to provide housing units that could be bought or rented at amounts deemed affordable to individuals whose household incomes met certain specified income guidelines.

4. Residential developers would earn Affordable Housing Credits ("AHCs") based upon the number of affordable housing units constructed and made available to qualified households. If residential developers constructed new affordable housing units that exceeded County requirements, they could earn "excess" AHCs. Such excess AHCs could be sold or transferred to other developers, for their use in satisfying affordable housing requirements for other projects. Any transfer of AHCs was subject to County approval.

5. Before obtaining final approval for any residential project subject to affordable housing requirements, developers were required to enter into an Affordable Housing Agreement ("AHA") with the County specifying the number of homes or lots that would be made available at affordable prices, or that the developer would use excess AHCs to satisfy its requirements.

6. As the OHCD Housing and Community Development Specialist, RUDO was responsible for ensuring residential developers complied with the County's affordable housing requirements. RUDO reviewed proposed developments and made recommendations on whether the County should enter into AHAs, which would be signed by developers and the Housing Administrator,

3

Corporation Counsel and Mayor of the County.  In addition, RUDO made recommendations on whether to accept land conveyances to the County or non-profit entities for the provision of affordable housing.

### III. *The public's right to honest services*

7.      The OHCD, the County and its citizens had an intangible right to the honest services of their public officials.  As an employee of the County, RUDO owed a fiduciary duty of honesty and loyalty to the citizens of the County to act in the public's interest and not for his personal enrichment.  RUDO was prohibited from taking official acts in matters in which he had a personal financial interest, and owed a duty to perform his work free from bribery or kickbacks.  Under the County's code of ethics, RUDO was specifically prohibited from soliciting or accepting any money, fee, commission, credit, gift, thing of value, or compensation of any kind which was provided, directly or indirectly, in exchange for official action and assistance.

### IV. *The agreement between Rudo and others to use jointly owned companies to deceive the County, accept bribes and kickbacks and thereby to breach Rudo's fiduciary duty of honesty and loyalty*

8.      RUDO and three individuals identified herein as Individuals 1, 2 and 3 agreed to use companies that they jointly owned and controlled to deceive the County and its citizens into believing that RUDO was performing his work

4

honestly and loyally, when in fact RUDO was taking official acts influenced by his receipt of bribes and kickbacks.  Individual-1 and Individual-3 were attorneys in the State of Hawaii, and Individual-2 did business in the State.  RUDO and these individuals collectively created, owned, managed and controlled three limited liability corporations (Companies herein identified as C, D and E) which purportedly intended to provide affordable housing.  RUDO took official acts that allowed those companies to receive land and AHCs, all while concealing his personal interest and involvement in the companies, and the fact that he would receive proceeds derived from AHAs and transactions approved by the County.

Conspiracy to Commit Honest Services Wire Fraud
(18 U.S.C. § 1349)

9.      The allegations contained in paragraphs 1 through 8 are incorporated herein.

10.     In or about and between December 2014 and October 2021, both dates being approximate and inclusive, within the District of Hawaii and elsewhere, ALAN SCOTT RUDO, the defendant, together with Individuals 1, 2 and 3, and others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud and deprive the OHCD, the County and its citizens of their intangible right to the honest services of RUDO through bribery and kickbacks, and for the purpose of executing such scheme and artifice, to transmit and cause to be

5

transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, sections 1343 and 1346.

## I. *The object of the conspiracy*

11.    The object of the conspiracy was to make it appear that RUDO was faithfully discharging his duties of honesty and loyalty to provide affordable housing to the County and its citizens, when in fact his official acts were tied to an agreement to take bribes and kickbacks from Individuals 1, 2 and 3, all while concealing RUDO's financial and personal interest in various matters in which he took official acts.

## II. *The manner and means of the conspiracy*

12.    The manner and means by which RUDO and his co-conspirators sought to accomplish the objectives of the conspiracy included, among others, the following:

a.    RUDO and Individuals 1, 2 and 3 collectively created, owned, managed, controlled and used Companies C, D, and E to make it appear as if those companies would develop affordable housing, when in fact they had no intention to do so.  Those companies, as well as at least two other limited liability corporations (Companies herein identified as A and B) and two trusts, were used to deceive

OCHD, the County and its residents, and to obtain and distribute AHCs, land and money, in the manner described below.

b.      RUDO helped Individuals 1, 2 and 3 draft and submit proposed AHAs to the OHCD falsely promising that their companies would develop affordable housing. In fact, the companies were intended to be used solely as conduits to receive both land and AHCs that could then be sold, with the proceeds being distributed between RUDO and his co-conspirators.

c.      RUDO used his official position as a Housing and Community Development Specialist to ensure that the OHCD approved the AHAs submitted by Individuals 1, 2 and 3 and their respective companies.

d.      RUDO and Individuals 1, 2 and 3 deceived the County into entering AHAs for the development of land in Waikoloa, Kailua-Kona and South Kohala, based on false promises that their companies would develop affordable housing. Under the AHAs, Companies C, D, and E received AHCs and a land conveyance having an aggregate value of at least $10,980,000. Despite receiving these awards, the conspirators did not develop any affordable housing units as promised.

e.      RUDO and Individuals 1, 2 and 3 thereafter sold or transferred the AHCs and land, and distributed the proceeds among themselves, with RUDO's share constituting bribes and kickbacks received in return for his official acts in obtaining the County's approval of the AHAs. RUDO and the individuals failed to

7

disclose that RUDO's official acts on behalf of the County were tied to an agreement to accept bribes and kickbacks or that he actually received and attempted to receive bribes and kickbacks totaling at least $1,817,716. RUDO and the individuals further concealed the fact that RUDO had control over the companies involved, as well as a financial interest in the particular AHAs and transactions in which he took official acts.

f.      To accomplish their objectives, RUDO and Individuals 1, 2 and 3 made, or caused to be made, various interstate wire communications, including emails concerning the approval of AHAs, the sale of both land and AHCs and the wire transfer of the proceeds of various transactions.

## A. *The Waikoloa scheme*

13.      Beginning in or about December 2016, RUDO took various steps to obtain OHCD's approval of an AHA ("AHA-1"). AHA-1 permitted a real estate development company to develop certain land and satisfy a pre-existing obligation to the County to provide affordable housing by donating approximately 11.8 acres of land in Waikoloa, Hawaii ("the Waikoloa Property") to Company-C. AHA-1 represented that Company-C was "a Hawaii non-profit corporation," as required by County regulations. In fact, and as RUDO then knew, Company-C was a for profit corporation that had been formed by Individual-1 for the purpose of selling the Waikoloa property for a profit.

14. In June 2017, RUDO helped the County finalize the terms of AHA-1, under which the developer promised to convey the Waikoloa property to Company-C. In reliance on Company-C's representations that it was a non-profit corporation, the County released the developer under AHA-1 from its obligations to provide affordable housing. RUDO then emailed AHA-1 to Individual-1, who exercised operational control over Company-C, for the purpose of hiding RUDO's involvement.

15. On January 22, 2018, Individual-1 and Individual-3 signed an agreement to operate Company-B, on the understanding that "no profits or cash distributions shall be guaranteed until [the Waikoloa property] is sold."

16. On January 23, 2018, Company-A and Company-B entered an agreement under which they would jointly own Company-C. Company-A was owned by RUDO through two trusts that had been created by Individual-1 and Individual-3 to conceal RUDO's interest in the company. The operating agreement between Company-A and Company-B provided that "no profits or cash distributions shall be guaranteed until [the Waikoloa property] is sold."

17. On January 29, 2018, the developer under AHA-1 conveyed ownership of the Waikoloa property to Company-C.

18.     In February 2018, Company-C agreed to sell the property to another company for $1,500,000.  The sales contract was signed by Individual-1 on behalf of Company-C.

19.     On May 11, 2018, the sale was completed and $1,488,639.14 in sale proceeds were wire transferred to an escrow account for the benefit of Company-C.

20.     On November 5, 2018, Individual-1 sent an email to RUDO and Individual-3 directing the disposition of the proceeds "in proportion to our percentages."  On or about February 18, 2019, Individual-1 sent an email to RUDO, Individual-3 and another person explaining the entities created to conceal RUDO's financial and ownership interest in Company-C.

21.     Through a variety of subsequent transactions, the proceeds of the Waikoloa sale were distributed among RUDO, Individual-1, and Individual-3.

22.     While taking official acts on behalf of the County with regard to AHA-1, RUDO failed to disclose his ownership interest in Company-C, or the fact that he was receiving proceeds from the foregoing transactions.

### B. *The Kailua-Kona scheme*

23.     In or about 2015, RUDO and Individuals 1, 2 and 3 formed Company-D, which they jointly owned and controlled.  In September 2015, RUDO sent an email from his official County address to the owner of approximately 13 acres of land in Kailua-Kona, Hawaii, known as Lots 16-A, 16-B and 16-C of the

10

Kealakehe Homesteads ("the Kailua-Kona Property"), explaining the benefits of owning AHCs. RUDO made it appear as if he was acting in the County's best interest to provide affordable housing, when in fact he was attempting to persuade the owner to sell the Kailua-Kona Property to Company-D, without revealing his ownership interest in that company.

24. RUDO then took various steps to obtain OHCD approval of an AHA ("AHA-2") between the County and Company-D. AHA-2 granted Company-D 104 AHCs in exchange for a promise to develop approximately 52 affordable housing units on the Kailua-Kona Property, which it did not own.

25. On or about December 17, 2015, Company-D bought the Kailua-Kona Property for approximately $14,076 and 46 AHCs acquired through AHA-2. On that same day, upon the recommendation of RUDO, the County released Company-D from "any and all obligations" to develop affordable housing under AHA-2 on one parcel of approximately 7 acres of the Kailua-Kona Property. Individual-3 signed the County's release on behalf of Company-D.

26. Following the partial release of Company-D's obligations to develop affordable housing, RUDO and Individuals 1, 2 and 3 engaged in various transactions that benefited them financially, as follows:

a. Company-D sold the approximately 7-acre portion of the Kailua-Kona Property for approximately $950,000, without having developed any affordable

11

housing on any part of the Kailua-Kona Property. The proceeds of that sale were intended to be distributed among RUDO and the co-conspirators.

b.      Company-D rented a 6-acre portion of the Kailua-Kona Property for approximately $84,000 a year to a developer who intended to build affordable housing there.

c.      Company-D sold two AHCs obtained through AHA-2 for $60,000, which Individual-2 intended to use to purchase "a Hawaii-like home … in [the] Bay area." The sale of the two AHCs was facilitated by a letter drafted by RUDO for Individual-3's signature under which Company-D sought OHCD's approval of the transfer.

27.     While taking official acts on behalf of the County with regard to AHA-2, RUDO failed to disclose his ownership interest in Company-D. Following his December 2018 resignation from OHCD, RUDO was prohibited from having any involvement with Company-D for one year. RUDO nonetheless continued to engage in, and benefit from, Company-D's business without the County's knowledge.

### C. *The South Kohala scheme*

28.     In or about February 2015, RUDO endorsed and ultimately secured OHCD approval of an AHA ("AHA-3") between the County and Company-E. AHA-3 granted Company-E 212 AHCs in exchange for a promise to develop 106

12

affordable housing units on approximately 4.6 acres of land in South Kohala, Hawaii ("the South Kohala Property") that Company-E did not own. While participating in OHCD's approval process, RUDO did not disclose his ownership interest in Company-E, which was also owned by Individuals 2 and 3.

29.    RUDO thereafter helped Company-E negotiate deals to buy the South Kohala Property, resell it at a profit, and retain and sell AHCs, all without developing any affordable housing units. The steps taken by RUDO and his co-conspirators included, among others, the following:

a.    In or about February 2015, using knowledge and expertise gained from his position at OHCD, RUDO identified various landowners who might be interested in buying AHCs. RUDO thereafter drafted letters for Individual-3 to sign on behalf of Company-E soliciting offers from those landowners for the purchase of AHCs that the company had acquired through AHA-3.

b.    On or about February 10, 2015, Individual-2 sent an email to RUDO, thanking him "for compiling such a valuable list" of large landowners in the County because "[w]ith judicious use, we can generate a market frenzy" for the purchase of the AHCs.

c.      On or about April 8, 2015, Company-E sold four AHCs obtained from AHA-3 for $200,000, and the proceeds were deposited into a bank account belonging to Company-E and controlled by Individual-2.

d.      In late April 2015, Company-E entered agreements under which it would (i) purchase the South Kohala Property from one real estate development company and (ii) resell the property to another real estate development company. After closing the two transactions on the same day, Company-E retained 17 AHCs from AHA-3 and took fees of approximately $45,000.

e.      On or about March 15, 2016, Individual-2 and Individual-3 sold five AHCs from AHA-3 for $150,000.  The proceeds were deposited into a bank account belonging to Company-E and controlled by Individual-2.

f.      On or about May 10, 2016, Company-D (collectively owned and controlled by RUDO, Individuals 1, 2 and 3) transferred four AHCs from AHA-2 to Company-E.

g.      On or about May 24, 2016, Company-E sold 12 AHCs for approximately $384,000. The proceeds were deposited into a bank account belonging to Company-E and controlled by Individual-2.

30.     Through a variety of subsequent transactions, the proceeds of the foregoing AHC sales were distributed among RUDO and the co-conspirators.

14

31.     While taking official acts on behalf of the County with regard to AHA-3, RUDO failed to disclose his ownership interest in Company-E, or the fact that he was receiving proceeds from the foregoing transactions.

All in violation of Title 18, United States Code, Section 1349.

## Forfeiture Notice

1.     The allegations contained in this Information are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The United States hereby gives notice to the defendant that, upon conviction of the offense charged in the Information, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in Title 18, United States Code, Section 1956(c)(7), which includes violations of Title 18, United States Code, Sections 1343, 1346, and 1349), or a conspiracy to commit such an offense, including but not limited to the following:

15

a.      A personal money judgment in the amount of at least $2,114,170, such sum having been obtained directly or indirectly as a result of the offense listed in this Information or is traceable to such property;

b.      Proceeds in the amount of $938,428.16 from the sale of the real property located at 74-5001 Kiwi Street, Kailua-Kona, Hawaii and designated as Tax Map Key No. (3) 7-4-004-091, which were seized by the United States on June 4, 2021;

c.      Proceeds in the amount of $752,064.46 from the sale of the real property located at 4426 SE 16th Place, Cape Coral, Florida, which were received by the United States on November 9, 2021;

d.      Proceeds in the amount of $499,626.34 from the sale of the real property located at 32-1077 Hawaii Belt Road, Ninole, Hawaii and designated as Tax Map Key (3) 3-2-003-024, which were seized by the United States on January 6, 2022;

e.      Proceeds in the amount of $133,771.33 from the sale of the real property located at 15-2697 Maiko Street, Pahoa, Hawaii, which were received by the United States on January 31, 2022;

f.      Forty-five affordable housing credits issued by the County of Hawaii to Company-D, which were seized by the United States on April 4, 2022;

16

g.      That certain real property known as Lot 16 – B of the Kealakehe Homesteads, being a portion of Grant 6273 to A. Napuupahee, titled in the name of West View Developments, LLC, and designated as Tax Map Key Number (3) 7-4-004-092, together with all appurtenances and improvements; and

h.      That certain real property known as Lot 16 – C of the Kealakehe Homesteads, being a portion of Grant 6273 to A. Napuupahee, titled in the name of West View Developments, LLC, and designated as Tax Map Key Number (3) 7-4-004-014, together with all appurtenances and improvements.

3.      If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty,

the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in paragraph 2, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

17

DATED:      July 11, 2022, in Honolulu, Hawaii.


CLARE E. CONNORS
United States Attorney
District of Hawaii


MOHAMMAD KHATIB
Assistant United States Attorney

18